IN THE UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

USCA Case No. 22-12336-JJ

United States District Court, Southern District of Florida

Case No.:  3:21-cv-00600-MCR-HTC

SUNZ INSURANCE COMPANY,

Plaintiff/Appellant

v.

UNITED STATES TREASURY DEPARTMENT, INTERNAL REVENUE
SERVICE, ET AL.,

Defendant/Appellee.

**PRINCIPAL BRIEF OF APPELLANT
SUNZ INSURANCE COMPANY**

AMY M. LEITCH (90112)
**AKERMAN LLP**
50 North Laura Street, Suite 3100
Jacksonville, FL  32202
Telephone:  (904) 798-3700
Facsimile:   (904) 798-3730
amy.leitch@akerman.com

EYAL BERGER (11069)
**AKERMAN LLP**
201 E. Las Olas Blvd., Suite 1800
Fort Lauderdale, FL 33301
Telephone: (954) 463-2700
Facsimile:  (954) 463-2224
eyal.berger@akerman.com

KRISTEN M. FIORE, BCS (FL 25766)
**AKERMAN LLP**
201 E. Park Ave., Suite 300
Tallahassee, Florida 32301
Telephone:  (850) 224-9634
Facsimile:   (850) 222-0103
kristen.fiore@akerman.com

*Attorneys for Appellant*

USCA Case No. 22-12336-JJ

*Sunz Insurance Company v. Internal Revenue Service, et al.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE PURSUANT TO FRAP 26.1 AND 11TH CIR. R. 26.1-1

Pursuant to F.R.A.P. 26.1 and 11th Cir. R. 26.1-1, Appellant, SUNZ INSURANCE COMPANY, by and through his undersigned counsel, hereby discloses the following trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock:

1. Akerman LLP (Attorneys for Appellant)

2. Berger, Eyal (Attorney for Appellant)

3. Sunz Insurance Company  (Appellant)

4. Fiore, Kristen M. (Attorney for Appellant)

5. Leitch, Amy M. (Attorney for Appellant)

6. Sheehan, Anthony T. (Attorney for Appellee)

7. Rodgers, M. Casey. (U.S. District Judge, N.D. Fla.)

8. United States Treasury Department, IRS (Appellee)

C-1

## STATEMENT REGARDING ORAL ARGUMENT[1]

Pursuant to Federal Rule of Appellate Procedure 34(a) and Eleventh Circuit Rules 28-1(c) and 34-3(c), Appellant Sunz Insurance Company ("Sunz") requests oral argument. The fundamental issue in this appeal is whether Sunz's security agreement adequately describes proceeds of a settlement agreement as collateral. The United States Bankruptcy Court for the Northern District of Florida (the "Bankruptcy Court") held that it did not.

In doing so, the Bankruptcy Court created common law that is diametrically opposed to Florida statutory law, importing a requirement of specificity into collateral descriptions that Florida's Uniform Commercial Code expressly disavows. *See, e.g.*, 679.1081(1) (holding that except in specific instances, a description of personal property is "sufficient, *whether or not it is specific*, if it reasonably identifies what is described." (emphasis added)). The United States District Court for the Northern District of Florida's District Court's (the "District Court" and together with the Bankruptcy Court, the "Lower Courts") affirmed.

---

[1] Citations to the record on appeal are by reference to docket entry numbers in the main Chapter 11 proceeding (*e.g.*, "Main Doc. ___"); reference to docket entry numbers in the underlying adversary proceeding giving rise to the appeal (*e.g.*, "Adv. Doc. ___"); reference to proofs of claim filed in the main Chapter 11 proceeding (*e.g.*, Claim No. ___); and reference to docket entries in the district court appellate proceeding (*e.g.*, "DC Doc. ___"). All citations are to the .pdf page number as opposed to actual page numbers.

Accordingly, this Court's decision will have far-reaching effects on commercial relations in Florida and in other states that have similar commercial codes. If permitted to stand, the Lower Court's decisions would upend the economic expectations of countless borrowers and lenders. Oral argument would aid the Court in unpacking the multi-step analysis required and the nuances and complexity of the matters presented in this case. These complicated circumstances were recognized by the Bankruptcy Court in the Order Denying *Plaintiff's Motion for Summary Judgment* and Granting Defendant IRS' Cross-Motion for Summary Judgment (the "MSJ Order"). [Adv. Doc. 177 at 2 ("The issues presented would make an excellent, but difficult, secured transactions final exam.")]

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS AND

    CORPORATE DISCLOSURE  STATEMENT .................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...................................................i

TABLE OF CONTENTS........................................................................................ iii

TABLE OF CITATIONS ......................................................................................vi

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF THE ISSUES..............................................................................2

STATEMENT OF FACTS AND COURSE OF PROCEEDINGS BELOW ...........3

STATEMENT OF THE CASE..................................................................................3

STANDARD OF REVIEW ....................................................................................13

SUMMARY OF THE ARGUMENT  ....................................................................14

ARGUMENT ..........................................................................................................16

I.    THE LOWER COURTS ERRED IN HOLDING THE SETTLEMENT
    AGREEMENT WAS NOT AN EXISTING CONTRACT WHEN THE
    SECURITY AGREEMENT WAS ENTERED INTO .................................16

    a.    Under Florida law, collateral can be identified by category and
    collateral descriptions are liberally construed and need not be
    specific...............................................................................................16

    b.    Sunz's Security Agreement attaches Debtor's "existing
    contracts" and proceeds therefrom....................................................18

c.    The Settlement Agreement was an existing contract when the Security Agreement was entered into by Sunz and the Debtor ..........19

d.    The Lower Courts erred in strictly construing the Collateral description ........................................................................................21

e.    The Bankruptcy Court erred in finding that "contract rights" is a sufficient collateral description, but "existing contracts" is not a sufficient collateral description because a distinction between these two categories is illusory and unsupported by Florida's Uniform Commercial Code or case law .............................................22

f.    The Lower Courts erred in finding that the Collateral description was ambiguous and invoking inapplicable and misapplied canons of contract construction because "existing contracts" is not ambiguous .....................................................................................24

g.    Alternatively, if the Collateral description is ambiguous, the Bankruptcy Court erred in granting the IRS's MSJ because when a contract is ambiguous, an issue of fact is presented as to the parties' intent which cannot properly be resolved by summary judgment ..............................................................................................29

h.    The Lower Courts erred in holding the Settlement Agreement was a commercial tort claim...............................................................30

II.    SUNZ'S SECURITY INTEREST REASONABLY IDENTIFIES THE BP SETTLEMENT AGREEMENT PROCEEDS AS COLLATERAL BECAUSE THE SECURITY AGREEMENT ATTACHES "ALL INTANGIBLE PROPERTY WHICH IS OR MAY BE USED IN THE BUSINESS OF [THE DEBTOR]." ............................................................39

a.    Sunz's Security Agreement Attaches Debtor's "all intangible property which is or may be used in the business of [the Debtor]" and proceeds therefrom, which reasonably identifies the Settlement Proceeds as Collateral. ......................................................39

iv

b.   Under Florida law, a description of collateral must be liberally construed and need not be specific and thus, the collateral description of "all intangible property which is or may be used in the business of [the Debtor]" is enforceable. ......................................40

CONCLUSION ........................................................................................43

CERTIFICATE OF COMPLIANCE ......................................................45

CERTIFICATE OF SERVICE ...............................................................45

66449778;4

# TABLE OF CITATIONS

**Page**

## CASES

*American Home Assur. Co. v. Larkin General Hosp., Ltd.*, 593 So.2d 195
  (Fla. 1992) ................................................................................................ 26

*Attorney's Title Guar. Fund, Inc. v. Town Bank*, 2014 WI 63 ¶ 23 n5
  (Wis. 2014) .......................................................................................... 32, 34

*Beach Towing Servs. v. Sunset Land*, 278 So.3d 857 (Fla. 3d DCA 2019) ............ 26

*Bivens Gardens Office v. Barnett Banks of Florida*, 140 F.3d 898
  (11th Cir. 1998) .................................................................................. 29, 30

*BP Expl. & Prod. Inc. v. Lake Eugenie Land & Dev., Inc.*, 574 U.S. 1054
  (2014) .........................................................................................................7

*Cheniere Energy, Inc. v. Parallax Enters. LLC*, 585 S.W.3d 70, 78-79
  (Tex. App.—Houston [14th Dist.] 2019) ............................................ 42

*Colbert v. First NBC Bank*, No. 13–3043, 2014 WL 1329834
  (E.D. La. Mar. 31, 2014) .................................................................... 36

*Green Auto., LP v. ATN Mgmt. Co., LLC.*, No. CIV-18-28-R, 2018 WL 4374204
  (W.D. Okla. Sept. 13, 2018) ........................................................... 41, 42

*Horton v. Metro. Life Ins. Co.*, 459 F. Supp. 2d 1246 (M.D. Fla. 2006) ................ 19

*In re Chorney*, 277 B.R. ............................................................... 23, 24, 32

*In re Dalen*, 259 B.R. 586 (Bankr. W.D. Mich. 2001) ............................................ 39

*In re Hintze*, 525 B.R. 780 (Bankr. N.D. Fla. 2015) ........................................ 41, 42

*In re Mgmt. By Innovation, Inc.*, 321 B.R. 742 (Bankr. M.D. Fla. 2005) ........ 17, 22

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on Apr. 20, 2010*,
  910 F. Supp. 2d at 914 ............................................................... 4, 7, 36

*In re Raymark Indus., Inc.*, 831 F.2d 550 (5th Cir. 1987) ...................................... 19

*In re Smith*, No. 8:10-bk-18731-MGW, 2017 WL 978995, at \*3
  (Bankr. M.D. Fla. Mar. 9, 2017) .................................................................. 36, 38

*In re: Standing Order of Reference Regarding Title 11*, Administrative Order
  (Bankr. N.D. Fla. June 5, 2012). ............................................................................1

*In re Stewart*, 583 B.R. 775 (Bankr. W.D. Okla. 2018) ................................... 36, 37

*In re Sublett*, 895 F.2d 1381 (11th Cir. 1990).......................................................... 13

*Jimani Corp. v. S.L.T. Warehouse Co.*, 409 So.2d 496 (Fla. 1st DCA 1982) ........ 24

*Johnson v. BP Exploration & Prod. (In re Deepwater Horizon)*, 786 F.3d 344
  (5th Cir. 2015)........................................................................................... 20, 38

*Lustig v. Peachtree Settlement Funding, LLC (In re Chorney)*, 277 B.R. 477
  (Bankr. W.D. N.Y. 2002)................................................................................... 22

*Merchants Bank v. Atchison (In re Atchison)*,  832 F.2d 1236 (11th Cir. 1987).... 28

*Russell Motor Car Co. v. United States,* 261 U.S. 514 (1923)........................ 25, 26

*Sims v. Wells Fargo Bank N.A. (In re Sims)*, 781 F. App'x 884
  (11th Cir. 2019)................................................................................................ 26

*Steve Hull Chevrolet, Inc.*, 513 So.2d at 219 ......................................................... 30

*Universal Underwriters Ins. Co. v. Steve Hull Chevrolet, Inc.*, 513 So.2d 218
  (Fla. 1st DCA 1987)........................................................................................... 29

## STATUTES AND CODE PROVISIONS

28 U.S.C. § 1291 ........................................................................................................1

28 U.S.C. § 158(a)(1)..................................................................................................1

§ 671.102, Fla. Stat. ...........................................................................................18, 22

§ 671.1021, Fla. Stat. .......................................................................24, 31

§ 679.1081(1), Fla. Stat...........................................................................17

§ 679.1081(2), Fla. Stat......................................................................17, 21

§ 679.1081(3), Fla. Stat...........................................................................17

§ 679.1081(5), Fla. Stat......................................................................17, 18

§ 679.1091, Fla. Stat ...............................................................................32

§ 679.2031, Fla. Stat. ..............................................................................16

§ 679.2031(1)(2)(c), Fla. Stat. ........................................................16, 19, 40

## RULES AND REGULATIONS

11th Cir. R. 26.1-1 ...............................................................................C-1

11th Cir. R. 28-1(c) ...................................................................................i

11th Cir. R. 32-4 ....................................................................................45

11th Cir. R. 34-3(c) ...................................................................................i

Fed. R. App. P. 26.1 ............................................................................C-1

Fed. R. App. P. 32(f) ..............................................................................45

Fed. R. App. P. 32(a)(5) .........................................................................45

Fed. R. App. P. 32(a)(6) .........................................................................45

Fed. R. App. P. 32(a)(7)(B) ....................................................................45

Fed. R. App. P. 34(a) .................................................................................i

## <u>OTHER AUTHORITIES</u>

§ 9–108 of the Uniform Commercial Code ............................................................ 17

§ 9–109 of the Uniform Commercial Code ...................................................... 32, 34

66449778;4

## STATEMENT OF JURISDICTION

The Bankruptcy Court had subject-matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334, and the District Court Order of Reference entered on June 5, 2012. *In re: Standing Order of Reference Regarding Title 11*, Administrative Order (Bankr. N.D. Fla. June 5, 2012).

The District Court had subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 158(a)(1), which grants the District Court jurisdiction to hear appeals from final judgments, orders, and decrees entered by the Bankruptcy Court.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1291. As explained in Sunz's Response to Jurisdictional Question filed in this Court on August 31, 2022, in which Sunz explained: "this Court has jurisdiction over this appeal because the bankruptcy court's March 25, 2021, order was a final and appealable order. That order disposed of all of the parties' claims, and the bankruptcy court executed its judgment by closing the proceeding. In short, Sunz' claim for turnover of cash collateral became moot when the bankruptcy court held that the IRS's tax lien prevailed over the security interest claimed by Sunz." [Res. at 1]

The final order of the District Court was entered on June 17, 2022. [DC Doc. 26.] This Appeal was timely filed on July 14, 2022 under Fed. R. App. P. 4.

1

## STATEMENT OF THE ISSUES

This appeal arises from the Bankruptcy Court's decision denying Sunz's motion for summary judgment ("Sunz's MSJ") and granting the Internal Revenue Service's ("IRS" or "Appellee") cross-motion for summary judgment, and the District Court's affirmance of the Bankruptcy Court's judgment.

The dispute at issue is whether Sunz is a creditor with a secured claim as to approximately $1 million (the "Settlement Proceeds") that Payroll Management, Inc. ("Debtor") received pursuant a settlement agreement or whether the IRS is entitled to the funds pursuant to their tax liens. The Bankruptcy Court and District Court held that Sunz's collateral description set forth in its security agreement did not sufficiently describe the settlement agreement and thus, the security agreement never attached to the settlement agreement proceeds.  In deciding this appeal, the Court must resolve, *de novo*, the following primary issues:

     I.    WHETHER THE LOWER COURTS ERRED IN HOLDING THE BP SETTLEMENT AGREEMENT WAS NOT AN EXISTING CONTRACT WHEN THE SECURITY AGREEMENT WAS ENTERED INTO.

    II.    WHETHER THE LOWER COURTS ERRED IN HOLDING THAT THE BP SETTLEMENT AGREEMENT WAS NOT AND CAN NOT BE USED IN THE BUSINESS OF THE DEBTOR.

66449778;4

## STATEMENT OF FACTS AND COURSE OF PROCEEDINGS BELOW

## STATEMENT OF THE CASE

### A. Introduction

Under Florida law, a collateral description in a security agreement must be liberally construed and is sufficient if it reasonably identifies what is being described. For example, a description is sufficient if it identifies collateral by category or by any other method so long as the collateral is objectively determinable. The description need not be specific unless, as relevant here, the collateral is a commercial tort claim.

Here, Sunz's security interest described the collateral as including, among other things, all "existing contracts" and "intangible property which is or may be used in the business of [the Debtor]," [Adv. Doc. 74-10 at 13 ¶ 2] and any proceeds from such collateral. At the time the Debtor and Sunz entered into the security agreement, the Debtor was party to a contract—a settlement agreement that settled and extinguished a commercial tort claim.

Despite the fact that the settlement agreement was an "existing contract" at the time the security agreement was entered into and was an asset used in the business of the Debtor, the Bankruptcy Court found that the Debtor had a commercial tort claim instead. In finding that the Debtor had a commercial tort

claim, the Bankruptcy Court disregarded the undisputable fact that the settlement agreement replaced the commercial tort claim the Debtor had.

The Bankruptcy Court also disregarded Florida law by strictly construing the collateral description, finding the description should have been more specific and inconsistently identifying *contract rights* as a sufficient collateral description without explaining how it substantively differed from the purportedly-insufficient *existing contracts* category. The Bankruptcy Court also applied an unsupported interpretation of the parties' intent to find the collateral description insufficient. The District Court affirmed in all respects. In this appeal, Sunz challenges that affirmance.

### B. The Debtor Initially Had a Commercial Tort Claim in 2010

In April 2010, there was an explosion aboard an offshore drilling rig, the *Deepwater Horizon*, resulting in the discharge of millions of barrels of oil into the Gulf of Mexico (the "Deepwater Horizon Incident"). [Adv. Doc. 74-1 at 1]

As a result of the Deepwater Horizon Incident, numerous lawsuits were filed against British Petroleum Exploration & Production, Inc., and a variety of other entities (the "BP Parties"). [*See id.*]

In August 2010, the United States Judicial Panel on Multidistrict Litigation centralized essentially all of the related federal actions in the United States District Court for the Eastern District of Louisiana (the "MDL Court"), and hundreds of

4

cases with thousands of individual claimants were eventually consolidated with that multidistrict litigation (the "MDL Litigation"). [*Id.*]

One of the pleading bundles created in the Multidistrict Litigation encompassed all private claims for economic loss, including loss of income, earnings, or profits, from the Deepwater Horizon Incident. [*Id.* at 1-2]

### C. Debtor's Commercial Tort Claim was Settled and Extinguished by the Settlement Agreement Before Sunz and Debtor entered into the Security Agreement

During this time, the BP Parties and interim class counsel began settlement negotiations, reached an agreement in principal, and submitted it to the MDL Court for approval. [Adv. Doc. 74-2; *see, e.g.*, Adv. Doc. 74-1 at 33-36]

In the interim time period, the Gulf Coast Claims Facility ("GCCF") had been established to receive and process claims for damages from the Deepwater Horizon Incident. [Adv. Doc. 74-2; *see also* Adv. Doc. 74-1 at 3]

The Debtor submitted a claim to the GCCF in 2012, including records demonstrating losses, and the GCCF notified the Debtor that it "qualif[ies] for compensation from the GCCF," and was entitled to $743,712.16 as an interim payment for its economic loss and more specifically, its lost profits. [Adv. Doc. 74-2]  The GCCF issued a check in that amount. [*Id.*]

Later that year, the MDL Court confirmed the certification of the economic class of claimants (the "Economic Class") for settlement purposes and approved the

class settlement agreement reached by the parties (the "Settlement Agreement"). [Adv. Doc. 74-3; *see also* Adv. Doc. 74-4; Adv. Doc. 77; Adv. Doc. 77-1]

The Settlement Agreement sets forth objective criteria for eligibility for compensation and the formula for calculating lost profits to determine a claimant's damages amount. [Adv. Doc. 74-4 at 22 § 4.3.8, 127-156 (Exs. 4A-4C); Adv. Doc. 77-1 at 22 § 4.3.8, 127-156 (Exs. 4A-4C)]

Anyone qualified as an Economic Class member could opt out of the Settlement or object to the Settlement Agreement. [Adv. Doc. 74-3 at 1-2; Adv. Doc. 74-4 at 68-70 § 8.2; Adv. Doc. 77-1 at 68-70 § 8.2]

If a claimant did not opt out of the Settlement, the claimant could not start, continue, or be a part of any other lawsuit against the BP Parties about claims being released by the Settlement Agreement as the terms of the Settlement Agreement make clear:

> All Economic Class Members who do not timely and properly Opt Out shall in all respects be bound by all terms of this Agreement and the Final Order and Judgment, shall be entitled to all . . . compensation for which they qualify under its terms, and shall be permanently and forever barred from commencing, instituting, maintaining or prosecuting any action based on any Released Claim against any Released Parties in any court of law or equity, arbitration tribunal or administrative or other forum.

[Adv. Doc. 74-4 at 69 § 8.2.4; Adv. Doc. 77 at 69 § 8.2.4]

Pursuant to the Settlement Agreement, the Economic Class Members released

6

and dismissed all claims against the BP Parties arising out of, due to, resulting from, or relating in any way to the Deepwater Horizon Incident (the "Released Claims"). [*Id.* at 72-73, 75-76 §§ 10.1-10.2, 10.12]

The Settlement Agreement is "the exclusive remedy" for the Economic Class Members with regard to the Released Claims. [*Id.* at 78 § 10.12.2]

The Settlement Agreement was implemented by the *Deepwater Horizon* Court Supervised Settlement Program ("Settlement Program"), and the Deepwater Horizon Claims Center ("DHCC") was formed to continue processing claims and take over from the GCCF. [*Id.* at 15-17 § 4.1]

A transition process was implemented to continue processing claims previously received by the GCCF. [*See id.*; Adv. Doc. 74-2; Adv. Doc. 74-1 at 3]

On or around September 7, 2012, the Debtor made a claim under the Settlement Agreement by submitting its Deepwater Horizon Economic and Property Settlement Registration Claim Form ("Registration Form") and Claim Form ("Claim Form") to DHCC to receive its damages owed pursuant to the Settlement Agreement. [Adv. Doc. 74-5, *see also* 74-6; *see also* 74-7; Adv. Doc. 22 at 3 ¶ 11; Adv. Doc. 32 at 2 ¶ 11]

The Settlement Agreement became effective on December 8, 2014 (after appeals concerning aspects of the Settlement Agreement were exhausted) and the final deadline for filing claims was June 8, 2015. *BP Expl. & Prod. Inc. v. Lake*

7

*Eugenie Land & Dev., Inc.*, 574 U.S. 1054 (2014) (denying review). [*See also* Adv. Doc. 74 at 7 n.4]

However, as indicated, the Debtor had already submitted its claim and requisite damage paperwork in 2012.

At no time did the DHCC (or its predecessor GCCF) challenge the Debtor's eligibility for, or right to, payment from the Settlement Program; rather, any dispute between the Debtor and DHCC concerned the calculation of damages. [Claim No. 42-2 at Part 2 (reporting that DHCC had offered to pay damages to the Debtor in or around February 2017, and indicating that the Debtor rejected such amount)]

For instance, in December 2017, the DHCC sent notification to the Debtor, acknowledging that the Debtor requested reconsideration of the original award amount for its claim. [Adv. Doc. 74-7 ] The notice declared the net award amount to be $1,070,330.23, and the calculation of damages demonstrated, among other things, that the Debtor was actually awarded $1,789,652.39 in total, but the $719,322.16 received from the GCCF in 2012 was subtracted out, yielding the $1,070,330.23 award. [*Id.*]

In March 2018, the Debtor's bankruptcy case was filed. [Main Doc. 1] On August 16, 2018, the DHCC sent its Notice of Payable Claim for Debtor Claimant with Open Bankruptcy, notifying the U.S. Trustee and others of the award amount of $1,070,330.23 and that it was aware of the bankruptcy case, and requesting certain

documents to issue payment, including an Order from the Bankruptcy Court approving the award. [Adv. Doc. 74-8] On November 13, 2018, the Bankruptcy Court entered its Order approving the award. [Main Doc. 107] On or around November 26, 2018, the Settlement Program issued the Debtor the Settlement Proceeds in the form of a check for $1,070,330.23. [Adv. Doc. 74-9]

### D. **The Security Agreement was Entered Into, and Sunz's lien was perfected, in 2015**

On or about September 15, 2015, the Debtor and Sunz entered into a Workers' Compensation Program Agreement (the "Program Agreement") pursuant to which Sunz issued to Debtor a large deductible workers' compensation insurance policy. [Adv. Doc. 74-10 at 2 ¶ 5; Adv. Doc. 22 at 2 ¶ 6; Adv. Doc. 32 at 2 ¶ 6]

To secure the payment and the performance of the Debtor's obligations under the Program Agreement, the Debtor and Sunz entered into that certain Pledge and Security Agreement on or around October 23, 2015 ("Security Agreement"). [Adv. Doc. 74-10 at 2 ¶ 6; *see also id.* at 12-19] Pursuant to the Security Agreement, the Debtor granted to Sunz a security interest and lien in all of its assets (collectively, the "Collateral"):

> A. **Business Assets of Pledgors.** All right, title, and interest of Pledgors in and to, but none of the obligations under or with respect to, the assets of the business of Pledgors; provided, however, that no security interest is granted by Pledgors to Secured Party in any trade names, trademarks, service marks, or any other intellectual property of Pledgors. Except as otherwise provided herein,

9

assets shall include, but not be limited to, ***all*** tangible and ***intangible property which is or may be used in the business of Pledgors***; the customer lists, including renewal policy information, related records and compilations of information; the identity, lists or descriptions of any new or potential customers, referral sources or organizations; marketing programs; financial information; ***contract proposals*** or bidding information; business plans; training and operations methods and manuals; software programs; reports; premium structures; ***existing contracts*** and policies;

**B. Proceeds.** ***All additions, substitutes and replacements for and proceeds of the above Collateral*** (including all income and benefits resulting from any of the above, such as dividends payable or distributable in cash, property or stock; interest, premium and principal payments; redemption proceeds and subscription rights; and shares or other proceeds of conversions or splits of any securities in the Collateral). Any investment property and/or securities received by Pledgor, which shall comprise such additions, substitutes and replacements for, or proceeds of, the Collateral, shall be held in trust for Secured Party and shall be delivered immediately to Secured Party, Any cash proceeds shall be held in trust for Secured Party and upon request shall be delivered immediately to Secured Party.

[*Id.* at 2-3 ¶ 7; *see also id.* at 13 ¶ 2]

On November 3, 2015, Sunz recorded a UCC-1 Financing Statement in the Florida Secured Transaction Registry. (*Id.* at 3 ¶ 8; *see also id.* at 20-22; Adv. Doc. 22 at 3 ¶ 8; Adv. Doc. 32 at 2 ¶ 8] The UCC-1 Financing Statement covers the Collateral. [Adv. Doc. 74-10 at 3 ¶ 9; *see also id.* at 13, 20-22]

By March 2017, the Debtor defaulted under the Program Agreement by failing

10

to maintain a loss fund in the amount of 200% of open case reserves plus 100% of the per accident deductible amount required the policy. [*Id.* at 3 ¶ 10]

As of the date the Debtor filed its bankruptcy case, the Debtor owed Sunz the total amount of $8,781,894. [*Id.* at 3 ¶ 11] The Debtor's continued failure to pay the amounts due and owing to Sunz constitutes an event of default under the terms of the Security Agreement. [*Id.* at 4 ¶ 12]

### E. The IRS's Purported Liens Did Not Arise Until Well After the Security Agreement Was Entered Into and Sunz's Lien was Perfected.

Appellee the Internal Revenue Service ("IRS") claims an interest in the Settlement Proceeds by virtue of federal tax liens dated March 7, 2017 and August 1, 2017. [Adv. Doc. 22 at 5 ¶ 21; Adv. Doc. 27 at 3 ¶ 21]

### F. Procedural History

In April 2019, Sunz initiated an adversary case against numerous entities, including the IRS, seeking, among other relief, a final declaratory judgment determining that Sunz holds a valid, duly perfected, first priority security interest in the Settlement Proceeds. [Adv. Doc. 1; *see also* Adv. Doc. 22] Sunz filed Sunz's MSJ, asserting that Sunz's security interest in the Settlement Proceeds is superior to the rights and claims of the IRS and the other defendants. [Adv. Doc. 74]

The IRS then filed its Response to Sunz's MSJ and its Cross-Motion for Summary Judgment ("IRS's MSJ"), asserting that Sunz did not have a lien on the Settlement Proceeds and "the federal tax liens have priority over Sunz's later-

11

perfected or simultaneously perfected claim." [Adv. Doc. 105]

The Bankruptcy Court entered an Order submitted by Debtor and agreed to by Sunz and IRS limiting the scope of Sunz's Summary Judgment to the "question of the interpretation of the collateral descriptions set forth in the UCC-1 Financing Statement recorded by Sunz . . . and the language and scope of the tax liens of the Internal Revenue Service ("IRS") . . . to determine which should prevail as against the other in priority" as to the Settlement Proceeds. [Adv. Doc. 177 at 9-10; Adv. Doc. 111 at 2]

Subsequent proceedings in the adversary proceeding settled and resolved other issues with every other defendant except the IRS, leaving Sunz and the IRS as the only remaining creditors asserting a first-priority claim over the Settlement Proceeds. [Adv. Doc. 177 at 10]

After Sunz and IRS briefed the lien perfection and priority issue as related to Sunz's UCC-1, the Bankruptcy Court determined the threshold issue was whether the collateral description in the Security Agreement (as opposed to the UCC-1) sufficiently describes the Settlement Proceeds and invited the parties to brief this issue. [Adv. Doc. 142] Sunz submitted a supplemental brief as did the IRS. [Adv. Doc. 152, 159]

The Bankruptcy Court entered the MSJ Order, denying Sunz's MSJ and granting the IRS's MSJ. [Adv. Doc. 177] The Bankruptcy Court held Sunz's security

interest did not attach to the "BP Claim."[2] [*Id.* at 13] The District Court affirmed. [DC Doc. 26][3]

## STANDARD OF REVIEW

As stated by this Court:

> This Court's standard of review with regard to determinations of law, whether made by the bankruptcy court or by the district court, is *de novo.* With regard to the bankruptcy court's factual determinations, "clearly erroneous" review applies. The district court in a bankruptcy appeal, like this Court itself, functions as an appellate court in reviewing the bankruptcy court's decision. Neither the district court nor this Court is authorized to make independent factual findings; that is the function of the bankruptcy court. If the bankruptcy court's factual findings are silent or ambiguous as to an outcome determinative factual question, the district court ... must remand the case to the bankruptcy court for the necessary factual determination. Moreover, "[a]s the second court of review," this Court's review of the district court's decision is entirely *de novo.*

*In re Sublett*, 895 F.2d 1381, 1383–84 (11th Cir. 1990) (citations and internal quotations omitted).

---

[2] The Bankruptcy Court defined "BP Claim" as the Debtor's economic damages claim "inclusive of all claim forms Debtor submitted" to both the GCCF and the DHCC. [*Id.* at 4]

[3] The District Court defined "BP Claim as follows: "Five months later in September 2012, Debtor submitted additional supporting documents (the 'BP Claim') to the [DHCC]." [DC Doc. at 3]

## SUMMARY OF THE ARGUMENT

The collateral description in the Security Agreement (defined below) includes all "existing contracts," and "all intangible property which is or may be used in the business of Pledgors," and includes the proceeds therefrom. Either of these categories sufficiently describes the Settlement Proceeds because each reasonably identifies the Settlement Agreement and the proceeds therefrom as collateral.

It is *undeniable* that the Settlement Agreement was an existing contract of the Debtor when the Debtor and Sunz entered the Security Agreement. It cannot be, and is not, anything else. All elements of forming a contract were satisfied. Though "existing contracts" adequately describes the Settlement Agreement, the Lower Courts ruled otherwise based on faulty reasoning. For example, the Bankruptcy Court ruled that Sunz's collateral description needed to be more specific. However, under Florida law, a collateral description need not be specific—listing a category of collateral will suffice. "Existing contracts" is such a category (as recognized by the District Court) that reasonably identifies the Settlement Agreement and thus, the Lower Courts' decisions should be overturned. The Lower Courts also made illusory distinctions between recognized "adequate" collateral descriptions and the collateral description at issue here, inappropriately invoked the *noscitur a sociis* maxim to find ambiguity in the Security Agreement, and improperly relied on parol evidence to infer the parties' intent without presentation of evidence on that issue.

14

Underpinning the Lower Courts' findings are the holdings that the Debtor had a commercial tort claim and the Collateral description fails to specifically describe that commercial tort claim. However, in making this ruling, the Lower Courts completely ignored the terms of the Settlement Agreement, which specifically settles and extinguishes any commercial tort claim the Debtor had against the BP Parties. The only remaining claim the Debtor had was a right to payment under the Settlement Agreement. Because the Lower Courts ignored the terms of the Settlement Agreement in finding that the Debtor still had a commercial tort claim when the Security Agreement was entered into, the Court should overturn the MSJ Order and the District Court's affirmance of it.

For similar reasons, the Lower Courts also erred in finding that the collateral description of all "intangible property which is or may be used in the business of Pledgors" and proceeds therefrom did not reasonably identify the Settlement Proceeds as collateral. For example, the Bankruptcy Court held that this language did not suffice to cover general intangibles because it was too broad and vague. However, this language is not akin to "all intangibles" (i.e. everything), which Sunz agrees would be too broad to be enforceable, because the description goes further to limit what types of intangibles are covered. Only the intangible property that is or may be used in the payroll business of the Debtor is included. Thus, a myriad of intangible property is excluded from coverage (*e.g.*, equity interests).

15

Nonetheless, the Bankruptcy Court concluded otherwise without explanation. [*See* Adv. Doc. 177 at 18-19 (finding that that "[s]imply tacking the vague phrase 'which is or may be used in the business of Pledgors' to 'all tangible and intangible property' does not add specificity or clarity that would reasonably identify the BP Claim as collateral.")] The District Court affirmed. Because collateral descriptions must be liberally construed and do not require the specificity the Lower Courts' applied, the rulings should be reversed as they resulted from a strict construction of the Collateral description.

## **ARGUMENT**

I. **THE LOWER COURTS ERRED IN HOLDING THE SETTLEMENT AGREEMENT WAS NOT AN EXISTING CONTRACT WHEN THE SECURITY AGREEMENT WAS ENTERED INTO.**

a. **Under Florida law, collateral can be identified by category and collateral descriptions are liberally construed and need not be specific.**

Section 679.2031, Florida Statutes, states in relative part: "Except as otherwise provided . . . a security interest is enforceable against the debtor and third parties with respect to the collateral only if . . . the debtor has authenticated a security agreement that provides a description of the collateral." § 679.2031(1)(2)(c), Fla. Stat. [4]

---

[4] Only the sufficiency of the Collateral description is at issue; the other elements of enforceability are not in dispute. Both the District Court and Bankruptcy Court recognized Florida's Uniform Commercial Code "governs the sufficiency of

Under Florida's Uniform Commercial Code and in general, "a description of personal or real property is sufficient, *whether or not it is specific*, if it reasonably identifies what is described." § 679.1081(1), Fla. Stat. (emphasis added). Indeed, a description of collateral in a security agreement is sufficient if 'the description does the job assigned to it: it makes possible the identification of the thing described.'" *In re Mgmt. By Innovation, Inc.*, 321 B.R. 742, 745 (Bankr. M.D. Fla. 2005) (quoting *Official Comment,* Section 9–108 of the Uniform Commercial Code).

Moreover, "a description of collateral reasonably identifies the collateral if it identifies the collateral by" the following:

> (a) Specific listing;
> (b) *Category*;
> (c) Except as otherwise provided in subsection (5), *a type of collateral defined in the Uniform Commercial Code*;
> (d) Quantity;
> (e) Computational or allocational formula or procedure; or
> (f) Except as otherwise provided in subsection (3), *any other method, if the identity of the collateral is objectively determinable*.

§ 679.1081(2), Fla. Stat. (emphasis added).

However, an unlimited description of "all the debtor's assets" or "all the debtor's personal property" or similar phrasing is an insufficient description. § 679.1081(3), Fla. Stat. Likewise and as indicated, subsection (5) of section 679.1081

---

descriptions of collateral" in security agreements or in other words, "whether a security agreement created an attachment to certain collateral." [DC Doc. 26 at 9; *see also* Adv. Doc. 177 at 13]

17

lists certain types of collateral defined by the UCC that will not be deemed as a sufficient description by themselves (*i.e.*, a description that merely states the UCC defined term alone will not suffice) as they require greater specificity of description:

> A description only by type of collateral defined in that chapter is an insufficient description of:
>
> (a) A commercial tort claim;
> (b) In a consumer transaction, consumer goods, a security entitlement, a securities account, or a commodity account; or
> (c) An account consisting of a right to payment of a monetary obligation for the sale of real property that is the debtor's homestead under the laws of this state.

§ 679.1081(5), Fla. Stat.

Courts should liberally interpret collateral descriptions. *See* § 671.102, Fla. Stat. (providing that Florida's UCC provisions should be "liberally construed").

### b. Sunz's Security Agreement attaches Debtor's "existing contracts" and proceeds therefrom.

Here, the Security Agreement includes "existing contracts" as Collateral: "All right, title, and interest of Pledgors in and to . . . the assets of the business of Pledgors . . . . [A]ssets shall include . . . contract proposals . . . existing contracts . . . ." [Adv. Doc. 74-10 at 2-3 ¶ 7; *see also id.* at 13 ¶ 2] The Agreement also includes "[a]ll additions, substitutions and replacements for and proceeds of the above Collateral." [*Id.*]

Because the Security Agreement described "existing contracts" and the proceeds therefrom as collateral, the Debtor's existing contracts and the proceeds therefrom were collateral securing the Debtor's obligations under the Agreement. *See* § 679.2031(1)(2)(c), Fla. Stat. As explained below, the Settlement Agreement was such an existing contract.

### c. The Settlement Agreement was an existing contract when the Security Agreement was entered into by Sunz and the Debtor.

It is axiomatic that a settlement agreement, including a class action settlement agreement, is a contract. *See, e.g., In re Raymark Indus., Inc.*, 831 F.2d 550, 553 (5th Cir. 1987) ("A settlement agreement is a contract"); *see also Horton v. Metro. Life Ins. Co.*, 459 F. Supp. 2d 1246, 1252 (M.D. Fla. 2006) ("Established rules of contract interpretation govern a class action settlement agreement.") Neither the Lower Courts nor the IRS cite any case law to the contrary.

Here, there can be no dispute the Settlement Agreement is a contract and was an existing contract when the Security Agreement was entered into by Sunz and the Debtor. As demonstrated above, by the time the Security Agreement was entered into in October 2015, the Settlement Agreement was already *court-approved*, effective, and final. The time for opting out of the Settlement Agreement had already passed, and the Debtor had already submitted its claim paperwork to the Settlement Program, including financial information in order for the Settlement Program to apply the objective formula to calculate Debtor's lost profits. In other words, there

is no dispute that by the time the Security Agreement was entered into, the Settlement Agreement was an existing contract between the Debtor and the BP Parties. It follows that the Settlement Agreement and the Proceeds therefrom were collateralized by the Security Agreement.

Ironically, the District Court recognized that "existing contracts" was a valid category under the Florida UCC, but misapplied a case to conclude that the Settlement Agreement was not one. [DC Doc. 26 at 12 ("While 'existing contracts may be a category that satisfies the Florida statute, the BP Settlement Agreement does not fit within that category.")] The District Court relied on *Johnson v. BP Exploration & Prod. (In re Deepwater Horizon)*, 786 F.3d 344, 355 (5th Cir. 2015). That case is inapposite because the crew-member party there was not part of the class and Settlement Agreement at issue here and to which the Debtor was a party. *See generally id.* Indeed, the Settlement Agreement had not even become effective or operative. *Id.* The District Court confused the individual settlement agreement formed between the crew member and BP with the later, class Settlement Agreement that governs the Debtor's rights and thus, imputed purported holdings to the Fifth Circuit in that opinion that were never addressed, discussed, or before the Fifth Circuit. [*See* DC Doc. at 13 (erroneously stating "As the Fifth Circuit has concluded, it is the determination letter that follows from this review process, not the Settlement Agreement itself, that constitutes a valid enforceable contract to settle.")]

Moreover, the District Court's reliance on the GCCF process and the determination letter as an analogy to the circumstances at issue here is improper as the Settlement Agreement was not yet in existence. The District Court also determined the Settlement Agreement is not a contract because it establishes a "claims process remedy." [*See, e.g.*, DC Doc. 26 at 12] Simply because the Settlement Agreement provides a means of implementation does not diminish it as a contract.

### d. The Lower Courts erred in strictly construing the Collateral description.

In the MSJ Order, the Bankruptcy Court held that Sunz's collateral description should have been more specific, suggesting it should have included "any claim in relation to the Deepwater Oil Spill." [Adv. Doc. 177 at 8 (stating "[n]either the Security Agreement, the Program Agreement, nor the UCC-1 executed by Debtor mention the BP Claim or any claim in relation to the Deepwater Oil Spill.")] However, Florida's Uniform Commercial Code does not require such specificity. While a specific listing will suffice, all that is needed is a description by "category," or "any other method, if the identity of the collateral is objectively determinable." § 679.1081(2), Fla. Stat.

Here, the Collateral lists as a category the Debtor's "existing contracts." The Settlement Agreement was an existing contract when the Security Agreement was entered into. Thus, the "description does the job assigned to it: it makes possible the

21

identification of the thing described," i.e., the Debtor's existing contracts, which includes the Settlement Agreement, and the proceeds therefrom. *See In re Mgmt. By Innovation, Inc.*, 321 B.R. at 745. Given that collateral descriptions should be liberally construed, the District Court should have reversed the Bankruptcy Court's strict construction of Sunz's collateral description. *See* § 671.102, Fla. Stat.

> **e. The Bankruptcy Court erred in finding that "contract rights" is a sufficient collateral description, but "existing contracts" is not a sufficient collateral description because a distinction between these two categories is illusory and unsupported by Florida's Uniform Commercial Code or case law.**

The Bankruptcy Court acknowledged that had Sunz's security interest listed "contract rights" instead of "existing contracts," it would have been sufficient. (*See* Adv. Doc. 177 at 16-17, 20-27]  However, the Bankruptcy Court cited no authority for the proposition that these two phrases should be treated differently under Florida's Uniform Commercial Code.

Instead, the Bankruptcy Court attempted to distinguish analogous cases cited by Sunz by noting that the cases cited used the words "contract rights" instead of "existing contracts." For example, in *Lustig v. Peachtree Settlement Funding, LLC (In re Chorney)*, 277 B.R. 477, 478 (Bankr. W.D. N.Y. 2002), the debtor signed a security agreement describing the collateral as "any and all contract rights . . . now existing or hereinafter acquired." A party filed an action claiming that the description was not sufficient to attach a security interest in a structured settlement to which the

22

debtor was a party. *Id.* at 479, 481. The bankruptcy court in *In re Chorney* found otherwise. *Id* at 487 (holding that "once the Debtor entered into the Settlement Agreement his personal injury tort claim, for purposes of [the applicable New York UCC section] was extinguished" and it was replaced by the contractual obligations to make payments under that agreement).

In purportedly distinguishing *In re Chorney*, the Bankruptcy Court stated:

> The court [in *in re Chorney*] then determined that the security agreement's language clearly granted a security interest in the debtor's Structured Settlement.
> The distinction between the instant case and *In re Chorney* is clear. The court in *Chorney* found that the bank intended to take, and the debtor intended to give, a security interest in the Structured Settlement, which was reasonably identified in the security agreement.
> By contrast, the collateral description in Sunz' Security Agreement gives absolutely no indication that Debtor intended to pledge or Sunz intended to obtain a security interest in the BP Claim, which is not reasonably identified.

[Adv. Doc. 177 at 21-22]

Given that there was no evidence of intent presented in *In re Chorney* other than the language of the security description, it is unclear why the Bankruptcy Court found that the "court in *Chorney* found that the bank intended to take, and the debtor intended to give, a security interest in the" debtor's Structured Settlement" [Adv. Doc. 177 at 21], and did not likewise find that here, based on similar language in the Security Agreement, that Sunz intended to take, and the debtor intended to give a

security interest in the Debtor's Settlement Agreement and the proceeds therefrom.[5] The Bankruptcy Court likewise attempted to distinguish *Jimani Corp. v. S.L.T. Warehouse Co.*, 409 So.2d 496 (Fla. 1st DCA 1982), based on the same reason. (*See* [Adv. Doc. 177 at 22 (distinguishing that case because the party there pledged "all contract rights" as opposed to "existing contracts")]

However, neither "contract rights' nor "existing contracts" is defined by Florida's Uniform Commercial Code. *See* § 679.1021, Fla. Stat. The Bankruptcy Court distinguished the phrase "contract rights" from "existing contracts" without any support in Florida's Uniform Commercial Code or otherwise, especially given that collateral descriptions are to be read liberally. Just as "contract rights" is a sufficient collateral description, so too is "existing contracts." And as indicated above, the District Court recognized "existing contracts" as a sufficient description.

> **f.  The Lower Courts erred in finding that the Collateral description was ambiguous and invoking inapplicable and misapplied canons of contract construction because "existing contracts" is not ambiguous.**

Applying the canon of *noscitur a sociis*, coupled with an improper reliance on parol evidence, the Bankruptcy Court concluded that "[t]he collateral description and security language, when read in context with Debtor's description of its

---

[5] The Bankruptcy Court noted in a footnote that "[t]he court's discussion of the issue suggests that the Structured Settlement was the debtor's only contract." [*Id.* at 21 n.68] However, the court in *In re Chorney* does not make, or discuss, this inference or assign any significance to this issue.

business, was obviously designed to encompass *insurance* contracts, contracts for leasing employees to Pledgors' customers, *insurance* policies, and other assets customarily used by Pledgors, including Debtor, in their employee leasing businesses." [Adv. Doc. 177 at 26]

The Bankruptcy Court's reliance on *noscitur a sociis* is misplaced because the collateral description in the Security Agreement is unambiguous. The Supreme Court has explained that application of the canon of *noscitur a sociis* is appropriate when the meaning of a word is ambiguous or subject to several meanings:

> That a word may be known by the company it keeps is, however, not an invariable rule, for the word may have a character of its own not to be submerged by its association. Rules of statutory construction are to be invoked as aids to the ascertainment of the meaning or application of words otherwise obscure or doubtful. They have no place, as this court has many times held, except in the domain of ambiguity. They may not be used to create but only to remove doubt. Moreover, in cases of ambiguity the rule here relied upon is not exclusive. The problem may be submitted to all appropriate and reasonable tests, of which 'noscitur a sociis' is one.

*Russell Motor Car Co. v. United States,* 261 U.S. 514, 519 (1923) (refusing to apply maxim to find that the words "any . . . contract" should be given a narrower meaning based on assimilation of other words in the same provision and finding that there,

"the meaning of the words considered severally is not in doubt, and the rule [of *noscitur a sociis*] is invoked not to remove an obscurity, but to import one).[6]

As indicated, there is no ambiguity in the Collateral description. The Bankruptcy Court did not state otherwise; it simply invoked the canon of *noscitur a sociis* without explaining the basis for its invocation. By doing so, the Bankruptcy Court attempted to use the maxim to create doubt, not remove it. *See id.* at 519. The phrase "existing contracts" is not obscure, doubtful, or subject to multiple meaning. It is unambiguous as evidenced by, among other things, the fact that no party has argued ambiguity.

The cases cited by the Bankruptcy Court in the MSJ Order do not suggest otherwise. None of these cases examined any issue in the context of the Uniform Commercial Code or evaluated the sufficiency of a collateral description. *See, e.g. Sims v. Wells Fargo Bank N.A. (In re Sims)*, 781 F. App'x 884, 887 (11th Cir. 2019) (interpreting master pooling and servicing agreement); *American Home Assur. Co. v. Larkin General Hosp., Ltd.*, 593 So. 2d 195, 197 (Fla. 1992) (interpreting performance bond), *Beach Towing Servs. v. Sunset Land*, 278 So. 3d 857, 861 (Fla. 3d DCA 2019) (interpreting a restrictive covenant within a deed).

---

[6] In *Russell Motor Car Co.*, the Supreme Court held that with regard to the provision at issue, "[t]he meaning of the several words, standing apart, being perfectly plain, what should be done is to apply them distributively, diverso intuitu, giving to each its natural value and appropriate scope . . . ." *Id.* at 520-521.

26

Accordingly, the District Court should have reversed the MSJ Order because the Bankruptcy Court improperly invoked this canon of construction as a tool to contradict the plain meaning of "existing contracts" and to rule that Sunz's security interest did not attach to the Settlement Agreement.

Moreover, even if the canon of *noscitur a sociis* was properly invoked, the Bankruptcy Court Court's application of it stretched too far and its reliance on parol evidence in support was inappropriate. The Bankruptcy Court stated "[t]he canon of *noscitur a sociis* means 'it is known by its associates;' words that are listed together should be given similar meaning." [Adv. Doc. 177 at 24] The Bankruptcy Court proceeded to cite a Case Management Summary authored by the Debtor's attorneys and filed in the main bankruptcy case ostensibly as evidence of the "word associates" of the "existing contracts" collateral description. [*Id.* at 24-25] But this document, which purportedly describes the Debtor's history and nature of business, is not an "associate" of the "existing contracts" language. It is a completely separate, unauthenticated, and unverified document that is unrelated to the list of assets described as collateral in the Purchase and Security Agreement. The Bankruptcy Court's reliance on this unrelated, separate, and unincorporated document stretched the canon of *noscitur a sociis* too far. [*See id.* at 26 (holding that "[t]he collateral description and security language, *when read in context with Debtor's description of its business,* was *obviously* [(emphasis added)] designed to encompass *insurance*

contracts").) Reliance on this parol evidence was improper. *Merchants Bank v. Atchison (In re Atchison)*, 832 F.2d 1236 (11th Cir. 1987) (reversing bankruptcy court where court improperly relied on parol evidence in evaluating security interest and noting general rule of contract law that in the absence of ambiguity, "a writing is the sole expositor of the parties' intent").

Moreover, the words listed together in the Collateral description do not even mention "insurance." In other words, the words listed together cannot be read to limit "existing contracts" to insurance contracts as the Bankruptcy Court found.

The Bankruptcy Court ignored this reality and moves on to infer that because the obligations secured by the Security Agreement are the Debtor's duties under the Program Agreement and the workers' compensation insurance policy issued pursuant to that agreement, the collateral description must, by association, be limited to insurance-type contracts. [Adv. Doc. 177 at 24 (noting "[t]he obligations covered by Sunz's Security Agreement are '[a]ll debts, obligations, liabilities, and agreements . . . arising out of or related to the Program Agreement and any policies of insurance issued thereunder . . . .'" to conclude that the collateral description "was obviously designed to encompass insurance contracts" and "insurance policies")] However, the obligation secured does need not be linked to, or associated with, the type of collateral securing that obligation. The Bankruptcy Court cited no authority to suggest otherwise, but simply concluded without support that the parties intended

28

to limit "existing contracts" to encompass insurance contracts. If the parties had intended to limit the Collateral description, they could have done so in the Security Agreement.

> **g. Alternatively, if the Collateral description is ambiguous, the Bankruptcy Court erred in granting the IRS's MSJ because when a contract is ambiguous, an issue of fact is presented as to the parties' intent which cannot properly be resolved by summary judgment.**

Summary judgment may be granted only if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "While the existence of ambiguity in a contract is a question of law for the judge to decide, the intent of the parties is an issue of fact." *Bivens Gardens Office v. Barnett Banks of Florida*, 140 F.3d 898, 905 (11th Cir. 1998) (finding the rules of Florida contract law applicable and citing related Florida case law). Accordingly, while "[t]he construction of a contract is ordinarily a question of law and belongs to the court provided that the terms used are unequivocal, clear, undisputed and not subject to conflicting inferences," a fact issue "is presented as to the parties' intent which cannot properly be resolved by summary judgment" when the terms of the contract are ambiguous, disputed, or reasonably susceptible to more than one construction. *Universal Underwriters Ins. Co. v. Steve Hull Chevrolet, Inc.*, 513 So.2d 218, 219 (Fla. 1st DCA 1987).

66449778;4

Here, the Bankruptcy Court found that the Collateral description was ambiguous as evidenced by, among other things, the Bankruptcy Court's improper invocation of unrelated parol evidence and the canon of *noscitur a sociis* and related case law to infer intent. [Adv. Doc. 177 at 24-25] It was therefore improper to grant the IRS's MSJ because "intent of the parties is an issue of fact," *Bivens Gardens Office*, 140 F.3d 898 at 905, that could not "be resolved by summary judgment." *Steve Hull Chevrolet, Inc.*, 513 So.2d at 219. Because the Court did not obtain evidence of intent from the parties and the IRS did not present any evidence of intent, the Bankruptcy Court erred in finding there were no disputed issues of material fact and the IRS was entitled to judgment as a matter of law. Thus, the District Court should have reversed the MSJ Order because the Bankruptcy Court should have required evidence of intent prior to ruling that the Security Agreement does not attach to the Settlement Agreement and Settlement Proceeds. Had the Bankruptcy Court done so, it would have found ample evidence that the Debtor intended to give a security interest in the Settlement Agreement and its proceeds. [*See, e.g.*, Main Doc. 214 (whereby the Debtor agrees that Sunz has a secured claim)]

### h. The Lower Courts erred in holding the Settlement Agreement was a commercial tort claim.

Despite the aforementioned undisputed facts, the Lower Courts found that the Debtor had a commercial tort claim. [*See, e.g.*, Adv. Doc. 177 at 16; DC Doc. 26 at 15]

Florida's Uniform Commercial Code acknowledges various types of collateral and has differing and distinctive definitions of what constitutes a "commercial tort claim" versus what constitutes a "general intangible," which includes "payment intangibles." More specifically, the Florida UCC defines those terms as follows:

> (m) "**Commercial tort claim**" means a claim arising in tort with respect to which:
>
> 1.  The claimant is an organization; or
>
> 2.  The claimant is an individual and the claim:
>
>> a.  Arose in the course of the claimant's business or profession; and
>> b.  Does not include damages arising out of personal injury to or the death of an individual.
>
> . . .
>
> (pp) "**General intangible**" means any personal property, including things in action, **other than** accounts, chattel paper, **commercial tort claims**, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. **The term includes payment intangibles** and software.
>
> . . .
>
> (iii) "Payment intangible" means a general intangible under which the account debtor's principal obligation is a monetary obligation.

§§ 679.1021 (m), (pp), (iii), Fla. Stat. (emphasis added).

31

The official comment to UCC § 9-109 assists in explaining the distinction between commercial tort claims and payment intangibles, which are general intangibles: "once a claim arising in tort has been settled and reduced to a contractual obligation to pay [(as in, but not limited to, a structured settlement)] the right to payment becomes a payment intangible and ceases to be a claim arising in tort." UCC § 9-109, Comment 15.[7]

Courts likewise recognize the difference and that namely, at some point, a commercial tort claim ceases to be such and is converted instead into a general intangible. *See, e.g.*, *In re Chorney*, 277 B.R. at 487–88; *Attorney's Title Guar. Fund, Inc. v. Town Bank*, 2014 WI 63 ¶ 23 n5 (Wis. 2014).

For example (and as indicated above), in *In re Chorney*, the debtor settled a personal injury claim in April 1990 by entering into a settlement agreement pursuant to which he would receive periodic lump sum payments from 1996 through 2011. *In re Chorney*, 277 B.R. at 479. In November 1999, the debtor obtained a loan from a bank and executed a security agreement, granting the bank a security interest in collateral described as follows:

---

[7] Section 679.1091 of Florida's UCC mirrors Section 9-109 of the Uniform Commercial Code such that the official comment is equally applicable and, in addition, is included in the Westlaw Editor's notes to the section. *See also* 45 Fla. Jur 2d Sales and Exchanges of Goods § 1 (noting that "The Official Comments to the Uniform Commercial Code have not been adopted as law in Florida but are persuasive in interpreting or applying the provisions of the Code." (citation omitted)).

> [A]ny and all contract rights, or personal property whether
> tangible or intangible, now existing or hereinafter acquired
> including, without limitation, any rights to cash payments
> due to Borrower and all right, title and interest of
> Borrower, Borrower's estate or any beneficiary thereunder
> to receive any monies under or pursuant to or on account
> of or related to any and all contract rights or other personal
> property, whether tangible or intangible, any monies
> actually received by Borrower, and any interest on the
> proceeds of all of the above composing or comprising all
> or any portion of any and all contract rights or other
> personal property, whether tangible or intangible, and all
> of Borrower's present or future right, title and interest to
> sell, assign, transfer, cause an early termination of, settle,
> receive consideration for, or undertake any similar activity
> with respect to any of the above.

*Id.* at 479-80.

The bankruptcy court held that "once the Debtor entered into the Settlement Agreement his personal injury tort claim, for purposes of [the applicable New York UCC section] was extinguished and it was replaced by the contractual obligation of [the settling party] to make the Structured Settlement Payments." *Id.* The bankruptcy court noted that the substituted contractual obligation to pay was not a claim arising out of tort, further explaining that if the settling party was to default on its payment obligation, the debtor would only have a contractual claim against the settling party as opposed to a claim in tort. *Id.* at 487-88.

The bankruptcy court further reasoned there was no transfer of an interest in a claim arising out of a tort as the security agreement was executed after the settlement agreement was signed, the tort claim was extinguished, and the debtor

33

had a contractual right to the settlement payments. *Id.* at 488. And while the bankruptcy court did not rely on the official comment to UCC § 9-109 for its finding that the right to the settlement payments was a general intangible (as the bankruptcy court was not applying Revised Article 9, to which Official Comment 15 to 9-109 applies), the court did acknowledge it. *Id.*

Likewise, in *Attorney's Title Guar. Fund, Inc.*, the Supreme Court of Wisconsin recognized the distinction between a security interest in the proceeds of a tort claim versus a tort claim itself, noting that a "claim involves many choices about whether and how to proceed, while proceeds are a payment intangible, which is simply the right to be paid." *Attorney's Title Guar. Fund, Inc.*, 2014 WL at ¶¶ 23-24 (citing Official Comment 15 to U.C.C. 9-109(d)(12) and noting the "real difference between the claim from which proceeds arise and the proceeds themselves.")

These cases recognize that a commercial tort claim does not remain so forever and is converted to a general intangible under Florida's UCC when the commercial tort claim is settled and the offending party has a contractual obligation to pay on the claim.

Here, any commercial tort claim the Debtor had was extinguished by the Settlement Agreement, a contract between the Debtor and the BP Parties that was effective at the time the Debtor entered into the Security and Pledge Agreement.

34

Indeed, pursuant to the terms of the Settlement Agreement, the Debtor could not bring, continue, or pursue a commercial tort lawsuit against the BP Parties because it has already settled and released its commercial tort claim against the BP Parties pursuant to the release provision in the Settlement Agreement and irrespective of whether the Debtor executed a redundant, individual release collateral to the Settlement Agreement. [Adv. Doc. 74-4 at 69 § 8.2.4; Adv. Doc. 77 at 69 § 8.2.4 ("All Economic Class Members who do not timely and properly Opt Out shall in all respects be bound by all terms of this Agreement and the Final Order and Judgment, shall be entitled to all . . . compensation for which they qualify under its terms, and shall be permanently and forever barred from commencing, instituting, maintaining or prosecuting any action based on any Released Claim against any Released Parties in any court of law or equity, arbitration tribunal or administrative or other forum.")]

The Settlement Program simply implemented the terms of the Settlement Agreement and was set up to pay the damages to which the Debtor and other class members were entitled. The Debtor's eligibility and damage amounts were determined pursuant to an objective criteria and formula under the Settlement Agreement. [Adv. Doc. 74-4 at 22 § 4.3.8, 127-156 (Exs. 4A-4C); Adv. Doc. 77-1 at 22 § 4.3.8, 127-156 (Exs. 4A-4C)] If the BP Parties refused to pay the Debtor damages, the only recourse the Debtor had was a contractual claim against the BP

Parties; it could not resurrect a commercial tort claim against the BP Parties. [*Id.* at 78 § 10.12.2]

The Bankruptcy Court ignored the terms of the Settlement Agreement, which specifically settled and releases the Debtor's commercial tort claim. Instead, the Bankruptcy Court noted other courts' "characterization" of the Deep water Horizon Oil Spill as a "mass tort action" and the payments made and proceeds of the BP Settlement Agreement as settlement of a "tort claim" or "environmental tort claim." [Adv. Doc. 177 at 14-15 (citing *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex., on Apr. 20, 2010*, 910 F. Supp. 2d at 914; *In re Stewart*, 583 B.R. 775, 780 (Bankr. W.D. Okla. 2018); *In re Smith*, No. 8:10-bk-18731-MGW, 2017 WL 978995, at *3 (Bankr. M.D. Fla. Mar. 9, 2017); *Colbert v. First NBC Bank*, No. 13–3043, 2014 WL 1329834 (E.D. La. Mar. 31, 2014)] The District Court agreed. [DC Doc. at 15]

These cases are inapposite. They address entirely different issues than those here—namely, application of Florida's Uniform Commercial Code—and only discuss payments and proceeds generically as opposed to in the context of any legal holding. *See, e.g., In re Smith*, 2017 WL 978995 (Florida's Uniform Commercial Code was not at issue). Thus, these generic "characterizations" are not legal characterizations or holdings and thus, are not persuasive and should be ignored.

As an initial matter, Sunz does not dispute that the Deepwater Horizon Incident resulted in a "mass tort" action. *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex.*, on Apr. 20, 2010, 910 F. Supp. 2d at 914.[8] As the Bankruptcy Court recognized, "Sunz and the IRS agree that the BP Claim originated as a commercial tort claim." (R.5-14, 228.) However, the Debtor's commercial tort claim in that mass tort class action was *settled* pursuant to the terms of the Settlement Agreement and ceased being a commercial tort claim under Florida's UCC as discussed above.

The opinion in *In re Stewart* is inapplicable because the issue there was whether debtors' attorney failed to timely disclose the amount and source of his compensation and whether disgorgement was an appropriate sanction for failing to do so. *In re Stewart*, 583 B.R. 775. In addition, the court in *In re Stewart* simply noted in explaining *background* that "the source of [the attorney's] payments was from proceeds of the tort claims against British Petroleum arising out of the April 2010 Deepwater Horizon oil spill in the Gulf of Mexico," *id.* at 779-80, and further noted that one of the attorneys "still holds in his trust account $71,724.71 of proceeds from the settlement of the Neverve, LLC, tort claim against BP." *Id.* at 780 n.7.

---

[8] This court approved the Deepwater Horizon Oil Spill claims and settlement procedures as recognized by the Bankruptcy Court. That opinion does not characterize payments made pursuant to or proceeds of the Settlement Agreement.

The *Colbert* opinion is also inapplicable because the issue there was whether a contract action could be dismissed for failure to join an alleged required party. 2014 WL 1329834 at *1. As *background*, the court noted that in 2012, parties entered into an agreement pursuant to which a security interest was given in, among other things "claims arising from or related to the Deep Water Horizon explosion and resultant BP Oil Spill." *Id.* Sunz does not contend that the court's characterizations of such claims as *commercial* tort claims in that case is improper because at the time the parties entered into the agreement and at the time the court's opinion was entered (March 31, 2014), the Settlement Agreement was not final at that time. Thus, there is no evidence presented in that case that the party did not still have commercial tort claims as opposed to a right to payment under a contract. *See id.*

As noted above, *In re Smith* is inapplicable because in that case, application of Florida's Uniform Commercial Code was not at issue. *See generally In re Smith*, 2017 WL 978995. And though the court in *In re Smith* stated that the debtor had to execute a release to receive settlement proceeds, that court, like the Bankruptcy Court here, does not address the release given in the Settlement Agreement, which is effective against the parties to the Settlement Agreement regardless whether an individual release is executed.[9]

---

[9] Moreover, a case relied upon by the District Court demonstrates that a contract can still be formed regardless whether an individual executes an individual release. *See Johnson v. BP Exploration & Prod. (In re Deepwater Horizon)*, 786 F.3d 344, 347

Just as the individual release does not trump the release set forth in the Settlement Agreement and transform the Debtor's claim back to a commercial tort claim, the Bankruptcy Court's approval of the payment from the DHCC was not required and thus, did not support the Bankruptcy Court's conclusion that the Debtor had a commercial tort claim until that approval was given. Among other things, bankruptcy court approval is not necessary in order for a settlement to be entered into, binding, or enforceable. *See, e.g.*, *In re Dalen*, 259 B.R. 586 (Bankr. W.D. Mich. 2001) (holding that the "settlement approval process referenced in the Bankruptcy Rules [are] discretionary, not mandatory" and settlement "may be pursue[d] and consummate[d] without bankruptcy court intervention" and noting that approval is often sought as a safe harbor).

Because it was error for the Bankruptcy Court to find the Debtor had a commercial tort claim even after the Settlement Agreement became effective, the District Court should have reversed the Bankruptcy Court.

## II.    SUNZ'S SECURITY INTEREST REASONABLY IDENTIFIES THE BP SETTLEMENT AGREEMENT PROCEEDS AS COLLATERAL BECAUSE THE SECURITY AGREEMENT ATTACHES "ALL INTANGIBLE PROPERTY WHICH IS OR MAY BE USED IN THE BUSINESS OF [THE DEBTOR]."

### a. Sunz's Security Agreement Attaches Debtor's "all intangible property which is or may be used in the business of [the Debtor]"

---

(5th Cir. 2015) (finding that parties formed a binding settlement agreement despite crew member's failure to sign a release, which BP argued was a condition precedent to recovery).

66449778;4

**and proceeds therefrom, which reasonably identifies the Settlement Proceeds as Collateral.**

As noted above, under Florida's Uniform Commercial Code, a security interest is enforceable against collateral if the security agreement "provides a description of the collateral." § 679.2031(1)(2)(c), Fla. Stat. Here, the Collateral description includes all "intangible property *which is or may be used in the business of the Debtor*" and all substitutes and replacements for and proceeds of the same. [*Id.* at 2-3 ¶ 7; *see also id.* at 13 ¶ 2 (emphasis added)] The Settlement Proceeds are lost-profit damages paid pursuant to the Settlement Agreement, which settled the Debtors' commercial tort claim, and such property resulted from the Debtor doing business and could be used in the Debtor's business. Indeed, the Settlement Proceeds were lost profits. Accordingly, the collateral description is enforceable. The Collateral description reasonably identifies a type or category of intangible property in which the Settlement Agreement and Proceeds (and all rights attendant) fall under.

**b. Under Florida law, a description of collateral must be liberally construed and need not be specific and thus, the collateral description of "all intangible property which is or may be used in the business of [the Debtor]" is enforceable.**

Nevertheless, the Bankruptcy Court found that the subject language was not specific enough. (*See* Adv. Doc. 177 at 20.). The Bankruptcy Court found that the Collateral description was too broad because "Sunz used neither the UCC specific 'general intangibles' nor a recognized subset," and "[i]nstead, Sunz's Security

40

Agreement used the overbroad, super-generic description, 'all tangible and intangible property.'") (*Id.*) As noted above, while parties are free to use specific terms defined by the Uniform Commercial Code, it is not required.

It is true that though liberally construed, collateral descriptions are not boundless. Descriptions such as "all assets" or "all intangibles" by themselves are vague and unenforceable. *See, e.g., In re Hintze*, 525 B.R. 780 (Bankr. N.D. Fla. 2015) (finding "all of [the debtor's] assets" as insufficient). But the Collateral description here includes all "intangible property *which is or may be used in the business of the Debtor*." Thus, the description specifically is not and is not akin to "all intangibles" (i.e. everything) because the description goes further to limit what types of intangibles are covered. Only the intangible property that is or may be used in the payroll business of the Debtor is included. Thus, a myriad of intangible property is excluded from coverage (*e.g.*, equity interests).

The Bankruptcy Court concluded otherwise, finding that "[s]imply tacking the vague phrase 'which is or may be used in the business of Pledgors' to 'all tangible and intangible property' does not add specificity or clarity that would reasonably identify the BP Claim as collateral." [Adv. Doc. 177 at 18-19] The Bankruptcy Court cited *Green Auto., LP v. ATN Mgmt. Co., LLC.*, No. CIV-18-28-R, 2018 WL 4374204 (W.D. Okla. Sept. 13, 2018), as support for this proposition. [Adv. Doc. 177 at 19 n.57] In that case, the court reviewed language in a letter agreement:

41

> In the event the Customer fails to pay as agreed or delays payments due beyond the agreed upon time frame, the Consultant shall provide written notice and a 10 day Notice will be provided to cure or bring current and such Default (sic). Thereafter, the Consultant will retain the rights to file a UCC claim on the Customer's assets related to the businesses.

(*Id.* at *2.) Citing *In re Hintze*, the court found that the description of "Customer's assets related to the businesses" was of similar import as "all of the debtor's assets," which is a description that does not reasonably identify the subject collateral under the uniform commercial code. *Id.* at *3.

Here, the Collateral description is narrower and more specific than in *Green Auto., LP*. The Collateral description is limited to only the intangible property that is or may be *used* in the payroll business of the Debtor as opposed to the broader "related to" language in *Green Auto., LP*. Moreover, the collateral description in *Green Auto., LP* purportedly covered all assets related to multiple businesses of the customer whereas here, it is clear that only one business of the Debtor is implicated and applicable. Accordingly, *Green Auto., LP* is inapposite as the collateral description was broader than the one at issue here. *See also Cheniere Energy, Inc. v. Parallax Enters. LLC*, 585 S.W.3d 70, 78-79 (Tex. App.—Houston [14th Dist.] 2019) (cited by the Bankruptcy Court and holding the even broader description of "[a]ll other tangible and intangible property and assets" did not reasonably identify the collateral). Thus, the District Court should have reversed the Bankruptcy Court's

ruling that the collateral description of "intangible property which is or may be used in the business of the Debtor" is too generic given that the Debtor's Collateral description should be liberally construed.

## CONCLUSION

The Lower Courts erred in finding that Sunz does not have a security interest in the Settlement Proceeds and accordingly, Sunz respectfully requests that the Court overturn the decisions.[10]

---

[10] The District Court did not address an errant sentence in the MSJ Order whereby the Bankruptcy Court purported to note that the Settlement Agreement included an anti-assignment clause [*See* Adv. Pro. Doc. at 16] and thus, this issue is not addressed herein. To the extent it is raised, Sunz incorporates its argument set forth in its Reply Brief filed with the District Court. [DC Doc. 23]

66449778;4

Respectfully submitted,

/s/ Amy M. Leitch
AMY M. LEITCH (90112)           EYAL BERGER (11069)
**AKERMAN LLP**                 **AKERMAN LLP**
50 North Laura Street, Suite 3100   201 E. Las Olas Blvd., Suite 1800
Jacksonville, FL  32202         Fort Lauderdale, FL 33301
Telephone:  (904) 798-3700      Telephone: ( 954) 463-2700
Facsimile:   (904) 798-3730     Facsimile:   (954) 463-2224
amy.leitch@akerman.com          eyal.berger@akerman.com
maggie.hearon@akerman.com       jeanette.martinez@akerman.com

KRISTEN M. FIORE, BCS (25766)
**AKERMAN LLP**
201 E. Park Ave., Suite 300
Tallahassee, Florida 32301
Telephone:  (850) 224-9634
Telecopier:  (850) 222-0103
kristen.fiore@akerman.com
myndi.qualls@akerman.com

*Attorneys for Appellant*

44

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B).  This brief contains 10, 702 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6).  It has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

/s/ Amy M. Leitch
AMY M. LEITCH

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 23, 2022, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all parties in this case whom are registered through the CM/ECF.

/s/ Amy M. Leitch
AMY M. LEITCH

45

66449778;4